IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| WESLEY ADAM WILLIAMS,                    ) | |
|     Petitioner,                                        ) | Civil Action No. 7:22cv00350 |
|                                                                   ) | |
| v.                                                                    ) | **MEMORANDUM OPINION** |
|                                                                   ) | |
| HAROLD W. CLARKE, Director,       ) | By: Robert S. Ballou |
|     Respondent.                                    ) | United States District Judge |

Petitioner Wesley Adam Williams, proceeding *pro se*, has filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging the convictions and sentence imposed by the Rockingham County Circuit Court in 2014. Respondent has filed a motion to dismiss. After considering the entire record, I must **GRANT** the motion to dismiss for the reasons stated below.

### I. BACKGROUND

On July 1, 2014, a Rockingham County Circuit Court jury convicted Williams of attempted capital murder and use of a firearm in the commission of an attempted capital murder. The trial court imposed the mandatory minimum sentence recommended by the jury, 23 years of incarceration. The evidence introduced at trial, in the light most favorable to the Commonwealth as the prevailing party, was summarized by the Supreme Court of Virginia:

> [O]n the evening of August 6, 2013, sixteen-year-old Isaac Dean ("Isaac") was driving home in his truck when he encountered Williams on horseback. According to Isaac, Williams was wearing jeans, but no shirt. He appeared "messed up" and was "swaying side to side." As Isaac drove by, Williams pointed a gun at Isaac through his open driver's side window. Isaac accelerated and, as he sped away, he heard a gunshot. He looked back and saw Williams shooting into the air. Isaac testified that Williams "shot a couple times."

Isaac drove to his home and told his mother, Kimberly Dean ("Kimberly"), what had happened. After Isaac told Kimberly what happened, they both called the police. Before the police arrived, Isaac and Kimberly saw Williams riding his horse toward their house. At some point, he fired a couple more shots. According to Isaac, Williams approached the back door of the house and stood at the door for two or three minutes. Eventually Williams got back on his horse and left.

Isaac further testified that, a few minutes after Williams left, he saw a marked police car come down the road. As the police car passed the driveway, Isaac and Kimberly saw Williams riding his horse toward the police car. Kimberly testified that after Williams charged the police car, he "roll[ed] the horse around" and went down the road, out of sight. At that point, an unmarked police car pulled into their driveway.

Deputy Jeremy Pultz ("Deputy Pultz") was the first officer to arrive on the scene. Deputy Pultz testified that he initially saw Williams riding on a horse as he pulled up in his patrol car. According to Deputy Pultz, Williams was approximately 10 feet away from him in his patrol car. Although Deputy Pultz described Williams as not wearing a shirt, he claimed he did not "notice" any tattoos on Williams' body. Photographs admitted at trial showed Williams had tattoos on his chest and arms, including a large tattoo of a bear claw on the left side of his chest and an even larger grim reaper tattoo on his left upper arm.

Deputy Pultz went on to testify that Williams turned and rode some distance away into the woods. Deputy Pultz exited his vehicle, and he and Williams yelled back and forth to each other. According to Deputy Pultz, Williams' speech was slurred.

Williams subsequently went further into the woods and Deputy Pultz lost sight of him due, in part, to the fact that it was getting dark. Deputy Pultz testified that he could hear the horse walking around for a while, but then he could no longer hear the horse. At some point thereafter, Deputy Pultz heard some shots fired "in the distance."

During this time, Investigator Shawn Morris ("Investigator Morris") and Investigator Wes Campbell ("Investigator Campbell") arrived in an unmarked police car. They were in radio contact with Deputy Pultz and could see and hear him near his patrol car. The investigators spoke with Isaac and Kimberly outside their house. They also heard shots fired approximately 250-300 yards away.

2

> Approximately 15 minutes after he last saw Williams, Deputy Pultz moved up the road on foot. At some point thereafter, Investigator Morris noticed an individual approaching Deputy Pultz on foot. [Footnote in court's opinion states that Morris testified that the individual who approached Pultz was not wearing a shirt, but in Morris' statement the day after the incident, he said he believed the individual was wearing a red shirt.] Investigator Morris admitted that he could not identify the individual approaching Deputy Pultz. Investigator Morris radioed Deputy Pultz stating, "he's coming right at you." Deputy Pultz testified that, after Investigator Morris radioed him, he saw "what looked like somebody running . . . or riding a horse or something and he was like swaying back and forth and he was in and out of the vegetation." Deputy Pultz also admitted that he could not identify the individual he saw as Williams.
>
> Deputy Pultz testified that, as soon as he saw the individual and realized how close he was, he identified himself as a police officer and yelled "let me see your hands." Receiving no response, Deputy Pultz repeated the announcement and command. He then heard the same voice he had heard earlier respond with "get out of here." Immediately thereafter, Deputy Pultz heard shots fired.
>
> When the first shot was fired, Deputy Pultz felt something hit his thigh. As Deputy Pultz backed away, moving from the middle of the road to the cover of the dense vegetation on the roadside, he heard four or five more shots coming from the same area. When asked if could tell where the shots were going, Deputy Pultz responded that "when the initial one went off it sounded like somebody had just taken rocks and just whizzed them past my head up in the trees." Deputy Pultz described the first shot as "kind of just a fluttering sound smacking the leaves" in the tree canopy above his head. Deputy Pultz did not testify regarding the trajectory of the remaining four or five shots. After he was able to get to cover behind a tree, Deputy Pultz was able to determine that he had not been shot, but he had been hit by a ricocheted rock.
>
> . . . . Williams' great aunt . . . had seen him the night of the shooting with a pistol in his hand. She testified as such at Williams' trial.

*Williams v. Clarke*, Record No. 210294, slip op. at 1–3 (Va. March 31, 2022).

At the conclusion of the Commonwealth's evidence and again at the end of trial, Williams' counsel moved to strike the evidence, arguing that the evidence was insufficient to

3

prove that Williams had the requisite intent to kill the deputy. Both motions were denied. The jury instructions were agreed to by the parties, and defense counsel did not request a jury instruction on voluntary intoxication. In closing arguments to the jury, counsel argued that the evidence was insufficient to prove that Williams was the shooter, and he did not argue lack of intent to kill.

During deliberations, the jury asked questions, including questions about the elements of attempted capital murder. As relevant to the current petition, one of the jurors' questions was "[i]f an officer tells a suspect to put down his weapon and [the] suspect pulls [a] gun and fires in the air, not in the direction of the officer, can he still be charged with attempted murder[?]" *Id.* at 4. Defense counsel argued to the court that there would clearly be no malice or intent in that situation, but the trial court ruled that the issue was a factual determination that the jury would have to make. The court instructed the jury to "apply your findings of fact to the instructions as provided to you." *Id.* at 5. Counsel agreed that the instruction was a proper statement of the law.

Williams appealed his convictions, alleging that the evidence was insufficient to identify him as the shooter and to show that he had an intent to kill Deputy Pultz. The Court of Appeals found the evidence sufficient and affirmed the convictions. *Williams v. Commonwealth*, Record No. 1700-14-3, 2015 WL 6952283 (Va. Ct. App. 2015). The court denied Williams' petition for rehearing on November 30, 2015, and the Supreme Court of Virginia refused to hear the appeal. *Williams v. Commonwealth*, Record No. 160027 (Va. Aug. 15, 2016). Williams did not file a petition for certiorari with the United States Supreme Court.

Williams filed a petition for habeas corpus relief in the Circuit Court of Rockingham County on August 15, 2017, raising three issues of ineffective assistance of counsel. The Circuit Court granted the respondent's motion to dismiss, finding that counsel's performance was not

4

deficient, and Williams appealed to the Supreme Court of Virginia. In a 10-page opinion, the appellate court affirmed the decision of the Circuit Court, denying habeas relief. *Williams v. Clarke,* Record No. 210294 (Va. March 31, 2022).

Williams then filed the current § 2254 petition in this court, raising the same issues raised in his state habeas case:

1. Trial counsel was ineffective in failing to argue lack of intent and lack of premeditation to the jury.

2. Trial counsel was ineffective in failing to request and argue a jury instruction on intoxication as a defense to attempted capital murder.

3. Trial counsel was ineffective in failing to object to the trial court's failure to answer the jury's question whether one shooting into the air can still be charged with attempted murder.

## II. Discussion

### A. Standard of Review

A federal habeas court may grant relief on a state claim adjudicated on the merits in state court only if the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). A decision is contrary to federal law only if it reaches a legal conclusion that is directly opposite to a Supreme Court decision or if it reaches the opposite result from the Supreme Court on facts that are materially indistinguishable from the Supreme Court case's facts. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A state's decision is an "unreasonable application" of federal law only if the

5

state court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). The question is not whether a federal court believes the state court's decision is incorrect, but whether the decision was unreasonable, which is a "substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). Likewise, the federal court must presume that the state court's factual findings are correct, and this presumption can be overcome only "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Again, the federal court must find more than just an incorrect determination of facts, as "unreasonable determination of the facts" is a "substantially higher threshold." *Schriro*, 550 U.S. at 473.

When considering claims of ineffective assistance of counsel, courts apply a highly deferential standard in evaluating counsel's performance. A petitioner must show that (1) counsel's performance was so deficient that she was not functioning as counsel guaranteed by the Sixth Amendment *and* (2) that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Petitioner must meet both prongs of the test, and if one prong has not been met, the court need not address the other.

Deficient performance requires a showing that counsel's performance fell below "an objective standard of reasonableness . . . under prevailing professional norms." *Id.* at 688. The reviewing court must not rely upon "the distorting effects of hindsight," but must presume that counsel's decisions and actions fell within the wide range of reasonable strategy decisions. *Id.* at 689–90. Under *Strickland*, a reviewing court strongly presumes that counsel rendered adequate decisions and that all significant decisions were made in the exercise of reasonable judgment. *Id.* at 690. The *Strickland* standard is "doubly deferential" in the context of a habeas petition

because the deferential standard of review required by § 2254 overlaps with the deferential standard under *Strickland*. *Woods v. Etherton*, 578 U.S. 113, 117 (2016). In other words, federal courts on habeas review are to give the benefit of the doubt to both the state court and the defense attorney. *Id.* at 117. Establishing deficient performance under *Strickland* "is never an easy task" but "establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Harrington*, 562 U.S. at 105.

Williams has failed to overcome the presumption of reasonableness of the state court's decision.

**B. Failure to Argue Lack of Intent**

Counsel's strategic decisions on how best to represent a client are given high deference under *Strickland*. Closing arguments are particularly entitled to such deference because of the broad range of legitimate defense strategies available. *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003). The *art* of persuasion and advocacy is not an exact science. Focusing on a small number of key points or on a single theme "may be more persuasive than a shotgun approach." *Id.* at 7. As the Supreme Court of Virginia noted in its opinion, the question is whether trial counsel's decision to focus on a mistaken identity theory of defense was reasonable based upon the evidence. Given the requirement to presume that strategic decisions of counsel are reasonable, and the specific facts of this case, the state court's decision that counsel's performance was not deficient is a reasonable application of *Strickland*.

The state court reasoned that counsel's decision to argue that Williams was not the one who shot at Deputy Pultz was reasonable because neither Deputy Pultz nor Investigator Morris could identify the person running towards Pultz when the shots were fired. Further, although Morris testified at trial that the man was not wearing a shirt, the day after the incident, he said

7

that the man was wearing a red shirt.  Likewise, when Deputy Pultz said he identified Williams as the shirtless man who approached his car originally, coming within 10 feet of him, he did not notice any tattoos on the man (even though Williams had eight tattoos).  Pultz lost sight of the man he identified as Williams when the man rode into the woods on the horse.  After some time, he could not even hear the horse.  Some 15 minutes later, a man that he did not get a good look at came towards him and he heard gunshots.  Pultz could not tell whether the man was riding a horse or running at that time.  No gun was ever found when Williams was arrested the next day, nor were any shotgun shells recovered from the area.  Arguing that the state had arrested the wrong person was reasonable under these circumstances.

Likewise, as the state court asserted, although some attorneys effectively use a shotgun approach, counsel could reasonably have been concerned that arguing Williams' lack of intent to kill Pultz could be construed as admitting that Williams was the person who fired the gun, undermining his misidentification defense.  This case is a quintessential example of hindsight distorting evaluation of counsel's performance.  Until the jury asked questions about intent— after closing arguments were over and the jury had begun deliberations, making it too late for counsel to revise his strategy—counsel reasonably could have determined that misidentification was the stronger defense theory.  The question is not whether a reviewing court, with the benefit of hindsight, would necessarily agree with the strategy, but whether it was reasonable.  A criminal defendant has the right to reasonable, competent counsel, "not perfect advocacy judged with the benefit of hindsight." *Yarborough*, 540 U.S. at 8.  The state court's habeas decision was reasonable, and I must deny this claim.

**C.  Failing to Request Voluntary Intoxication Jury Instruction**

Deciding what jury instructions to request is ordinarily a matter of trial tactics that is left to the sole discretion of trial counsel. *Shipe v. Ray*, No. 7:09cv00454, 2010 WL 378438, at *10 (W.D. Va. 2010). Even if a defendant is entitled to an instruction on an issue, counsel may have a valid strategic reason for not requesting the instruction. *Brown v. Clarke*, No. 7:21cv00302, 2022 WL 1495000, at *17 (W.D. Va. 2010). When considering claims of ineffective assistance of counsel, a reviewing court must presume that strategic decisions have been made within the wide range of reasonable professional options. *United States v. Shareef*, 852 F. App'x 92, 95 (4th Cir. 2021) (unpublished) (citing *Strickland*, 466 U.S. at 689).

The state's habeas opinion held that counsel's decision to argue identification rather than lack of intent made a voluntary intoxication instruction irrelevant, and therefore, counsel reasonably chose not to request the instruction. The court's application of *Strickland* is reasonable. The factual determination that counsel made a strategic decision is bolstered by counsel's motion to strike, made solely to the court, in which he argued lack of intent. This infers that counsel chose not to argue intent to the jury; he was aware of the argument but reasonably chose not to make the argument to the jury for the reasons discussed in Section B above. Thus, his performance was not deficient.

The Supreme Court of Virginia also noted the observation of the circuit court in its habeas decision that there was ample evidence of Williams' intoxication, but the evidence did not indicate that the intoxication was sufficiently severe to negate his ability to premeditate; therefore, if requested, the instruction might not have been given. *Williams*, No. 201294, at *6. Mere intoxication is not sufficient to negate premeditation; one is entitled to the voluntary intoxication instruction only if there is sufficient evidence to infer intoxication to the point of inability to premeditate. *Jenkins v. Commonwealth*, 423 S.E.2d 360, 368 (Va. 1992). If the

instruction would not have been given, even if requested by counsel, then Williams cannot prove any prejudice from counsel's failure to offer the instruction. *See Hope v. Cartledge*, 857 F.3d 518, 523 (4th Cir. 2017) (noting that whether an instruction, if requested, should have been given is an important part of the prejudice inquiry). Because the state court reasonably determined that Williams proved neither deficient performance nor prejudice, I must dismiss this claim.

**D. Failure to Object to the Court's Answer to the Jury's Question**

When the jury asked whether a suspect who pulls a gun and fires in the air but not in the direction of the officer could still be charged with attempted murder, defense counsel urged the court to recognize that the situation would not be enough to show an intent to kill. The state habeas opinion reasonably noted that this argument implicitly asked the trial court to instruct the jury that firing into the air was insufficient as a matter of law. The trial court responded that this was a factual matter for the jury to decide, and he would instruct the jury to make a factual finding and apply the law from the jury instructions to the facts. "It is entirely proper for the court to refer the jury back to the court's original charge." *United States v. Barasanti*, 943 F.2d 428, 438 (4th Cir. 1991). Once the court announced its entirely proper decision, counsel reasonably recognized that further argument or objection would be futile. Counsel is not required to make futile motions or arguments. *Sharpe v. Bell*, 593 F.3d 372, 383 (4th Cir. 2010). The state habeas decision is reasonable, and I must dismiss this claim.

### III. Conclusion

For the reasons stated, I will grant the respondent's Motion to Dismiss.

I decline to issue a certificate of appealability because Williams has not made a substantial showing of the denial of a constitutional right.

A separate Final Order will be entered this date.

Enter: December 19, 2023

/s/ Robert S. Ballou

Robert S. Ballou
United States Magistrate Judge

11